UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | |
|---|---|
| ELAINE STEWART, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LINCOLN NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| Defendant. | ) |

**COMPLAINT**

COMES NOW Plaintiff, Elaine Stewart, and for her claims and causes of action against Defendant, Lincoln National Life Insurance Company, states:

PARTIES

1. Elaine Stewart ("Stewart") is a resident and citizen of the State of Kansas.

2. Lincoln National Life Insurance Company ("Lincoln") is an out of state insurance company authorized to do business in the State of Kansas.

JURISDICTION AND VENUE

3. Stewart brings her claim pursuant to the Employee Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq*.

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the District of Kansas under 29 U.S.C. § 1132(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

1

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

## STATEMENTS OF FACT

9. At all times relevant, IPL USA, Inc. ("IPL") employed Stewart.

10. IPL employed Stewart as a molding packer. On February 28, 2018, as a condition of her employment, Stewart was required to undergo a physical exam that involved, among other demands, lifting 65 pounds.

11. Stewart's occupation involved a range of duties, including carrying boxes, occasional lifting of 65 pounds, frequent carrying of up to 50 pounds, overhead reaching, stooping, and crouching.

12. The Dictionary of Occupational Titles states that the occupation of Packer is situated at the medium exertional level.

13. IPL sponsored a group welfare benefits plan for its participating employees ("Plan").

14. The Plan constitutes an employee welfare benefit plan as defined by 29 U.S.C. § 1002(1).

15. The Plan offered long-term disability ("LTD") benefits.

16. At all relevant times, Stewart has been a Plan participant and covered person.

17. IPL is the administrator of the Plan.

18. IPL delegated to Lincoln the function of issuing LTD benefit claim determinations.

19. Lincoln's group insurance policy ("Policy") articulates the conditions that covered Plan participants must satisfy to receive LTD benefits.

20. The Policy defines Total Disability or Totally Disabled as:

> **TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
>
> The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

21. The Policy defines Own Occupation or Regular Occupation as:

> **OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:
> 1. in which the Insured Employee was employed with the Employer prior to Disability; and
> 2. which was his or her main source of earned income prior to Disability.
>
> It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles. It includes any work in the same occupation for pay or profit, regardless of:
> 1. whether such work is with the Employer, with some other firm, or on a self-employed basis; or
> 2. whether a suitable opening is currently available with the Employer or in the local labor market.

22. The Policy defines Main Duties or Material and Substantial Duties as:

> **MAIN DUTIES or MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
> 1. are normally required to perform the Insured Employee's Own Occupation; and
> 2. could not reasonably be modified or omitted.
>
> To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation. It will apply the Act's standards, whether or not:
> 1. the Employer is subject to the Act; or
> 2. the Insured Employee has requested such a job accommodation.
>
> An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.
>
> Main Duties include those job tasks:
> 1. as described in the U.S. Department of Labor Dictionary of Occupational Titles; and
> 2. as performed in the general labor market and national economy.
>
> Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site.

23. In November 2018, Stewart was assaulted by a co-worker. Stewart filed a work injury report.

24. Thereafter, Stewart experienced pain and muscle spasms in and around her spine.

25. On November 9, 2018, Stewart saw Ramon Nichols, MD at Corporate Care. He opined that she should lift 15 pounds or less, should push or pull 20 pounds or less, and should not work above the head level.

26. Stewart experienced further injury as a result of a co-worker yanking Stewart's arm above her head.

27. As a result of her deficits, Stewart temporarily transitioned to an accommodated light duty position with IPL.

28. On November 19, 2018, Stewart was evaluated for physical therapy. Abnormal findings were noted in posture, in her cervical spine, her thoracic spine, and in her shoulders. Physical therapy was recommended, which Stewart properly attended.

29. On December 3 and December 17, 2018, Stewart again saw Dr. Nichols. He opined Stewart should not lift more than 15 pounds, should not push/pull more than 20 pounds, and should not work at or above the head level. Stewart continued physical therapy in December 2018.

30. On January 14, 2019, Stewart saw Joseph Galate, MD on referral. She reported pain in her shoulder area. On exam, spasm in the upper right trapezius, levator scapula, rhomboids, and latissimus dorsi were noted. Dr. Galate opined that Stewart should not engage in repetitive bending, twisting, or lifting and should not lift more than 15 pounds. He opined that she should not perform overhead activities and should not push or pull more than 25 pounds.

31. January 22, 2019 MRI of the thoracic spine revealed moderate disc bulging and multiple levels of degeneration:

> Impression:
> Multilevel thoracic spondylosis with disc bulging at essentially all levels and mild multilevel anterior osteophytosis. Disc bulging is moderate at T6-T7, T7-T8 and T8-T9 with effacement of the ventral CSF and mild relative canal narrowing.

32. A February 28, 2019 MRI of the cervical spine revealed mild changes at multiple levels:

> IMPRESSION:
>
> Mild multilevel disc desiccation and posterior disc bulging/disc osteophyte complexes.
>
> At C5-C6, there is a small mildly undulating posterior disc osteophyte complex asymmetrically prominent into the right paracentral and right lateral recess region seen on axial T2 slice 16 of series 801. There is probable effacement of the exiting right C6 ventral nerve root seen on image 16.

33. By March 7, 2019, IPL no longer would accommodate Stewart's limitations and restrictions. As a result, she ceased working and became Totally Disabled.

34. Stewart applied for LTD benefits with Lincoln.

35. Stewart applied for benefits with the Social Security Administration.

36. On January 28, February 18, February 27, March 4, May 24, June 1, July 1, July 22, and August 13, 2019, Stewart again saw Dr. Galate. She reported pain after work conditioning. On exam, intermittent paresthesia was noted in the right scapulothoracic region. Thoracic disc bulge and thoracic sprain were assessed. Imaging of the cervical spine showed multilevel degeneration and disc bulge with stenosis at C6-C7.

37. Dr. Galate generally opined that Stewart should not engage in repetitive bending, twisting, or lifting; should not lift more than 10 pounds; should not perform overhead activities; and should not push or pull more than 25 pounds. Dr. Galate also administered trigger point injections.

38. Stewart underwent considerable physical therapy and work conditioning. By her providers' accounts and by her own reports, she gave good effort and made some improvement in her ability to lift. Stewart attended physical therapy regularly and as recommended by physicians, including multiple appointments on a weekly basis throughout the summer and fall of 2019.

39. On August 29, 2019, Stewart reported to her physical therapist that she had some improvement but suffered from recent left upper trap discomfort. Stewart questioned her ability to perform a full shift at work. She attempted to lift 65 pounds three times and 25 pounds 65 times. However, the demands of physical therapy exacerbated her pain.

40. On September 3, 2019, Stewart reported to Dr. Galate that she experienced neck and mid back pain and stiffness after work conditioning. On exam, she exhibited numbness in her right scapulothoracic region. Upon review of imaging, Dr. Galate opined that Stewart should

5

be limited to lifting, pushing, and pulling 20 pounds. He also opined against overhead reaching and repetitive bending, twisting, and lifting.

41. On Stewart continued physical therapy throughout September and October 2019. On October 7, 2019, physical therapy exam findings revealed tenderness to palpitation at the inferior angle of the right scapula, in the body of the left scapula, and in her lower back. She expressed concerns over her ability to perform repeated bending any significant lifting. When performing physical therapy, lifting was restricted to 15 pounds at ten inches as a result of complaints resulting from the previous week's therapy. A summary of goals stated:

1) Pt. will demonstrate the ability to stand x 90 min to meet job demands.; Status: **Progressing**
2) Pt able to lift 40# x 10 reps from knuckle to shoulder to meet frequent job demands.; Status: **Not Met**
3) Pt able to lift 65# x 4 reps from 10" to waist to be able to meet occasional job demands.; Status: **Not Met**
4) Pt able to lift 25# x 64 reps in one hour to meet constant job demands.; Status: **Not Met**
5) Patient will demonstrate the ability to lift 65# with to 3 tiers x 3 reps to meet job demands.; Status: **Not Met**
6) Patient will demonstrate the ability to lift up to 25# x 3 tiers to meet job demands.; Status: **Not Met**

42. On October 9, 2019, Dr. Galate noted that Stewart had attended 35 physical therapy visits. Remarkably, she had just one cancelation. He expressed some doubt that she would be able to satisfy her job's lifting requirement. He continued work limitations against repetitive bending, twisting, or lifting; against lifting exceeding 20 pounds; against overhead activities; and against pushing or pulling greater than 25 pounds.

43. On October 30, 2019, Stewart complained to Dr. Galate of a burning sensation in her tailbone, as well as intermittent pins and needles down the backs of her arms and legs. Intermittent paresthesia was noted on exam in her right scapulothoracic region. Dr. Galate noted that her occupation showed lifting up to 100 pounds. Work limitations included no repetitive bending, twisting, or lifting; no lifting exceeding 20 pounds; no overhead activities; and no pushing or pulling greater than 25 pounds.

44. On Stewart's follow up forms for Dr. Galate's office, she reported headaches and increased blood pressure as a result of trigger point injections. Stewart sought treatment from a family

medicine physician to treat that condition.

45. On December 11, 2019, Stewart was evaluated by Daniel Zimmerman, MD. She reported pain and discomfort related to her thoracic spine. On exam, she exhibited tenderness from T2 to T10 in palpation over the thoracic paraspinous musculature bilaterally. Thoracic range of motion was reduced. Dr. Zimmerman took x-rays, which revealed multilevel osteoarthritic change (worst at T6-T7 and T9-T10 on the right side). Stewart explained to Dr. Zimmerman that physical therapy and work conditioning had intensified her pain and discomfort. Dr. Zimmerman recommended continued treatment of her pain, including anti-inflammatory medication and injections.

46. On December 17, 2019, Dr. Bailey recommended a lumbar MRI. He concluded that Stewart's cervicothoracic spine impairment "has reached an endpoint." He also found that Stewart suffered from SI joint dysfunction and might benefit from injections. Dr. Bailey later opined that Stewart could work on a "medium light duty status."

47. On February 5, February 13, March 3, and June 5, 2020, Stewart underwent lumbar trigger point injections with Daniel Bruning, MD.

48. On June 15, 2020, longtime Lincoln employee Faye Mize, RN offered her opinion as to Stewart's functional capacity. She concluded that Stewart's medical records did not support any level of functional impairment. RN Mize's did not articulate why she rejected physician opinions finding that Stewart was limited in her ability to lift, carry, push, pull, bend, reach, and engage in repetitive activities.

49. On June 25, 2020, Lincoln sought an opinion from Robert J. Cirincione, MD. He did not have access to Stewart's complete medical records. Based on the sample that he received, he opined that Stewart did not suffer from any functional impairment. He also opined that

Stewart did not require any additional treatment.

50. On June 30, 2020, Lincoln issued an initial decision denying Stewart's LTD claim. Lincoln cited to the opinion of Dr. Cirincione and concluded that "the medical records do not support any level of functional impairment." The letter incorrectly stated that Stewart's "clinical examinations have been normal."

51. On July 13, 2020, Stewart saw Michael J. Poppa, DO. Exam findings were abnormal in multiple domains. Dr. Poppa assessed lumbar radicular syndrome. He opined that Stewart should not lift, push, pull or carry more than 25 pounds on an occasional basis. He limited lifting to knee height through chest height on an occasional basis. Dr. Poppa also opined that Stewart should alternated between seated and standing positions.

52. On July 28, 2020, Stewart saw Audrey Lasley, FNP. She reported swelling in her ankles bilaterally. Exam revealed non-pitting edema in her lower extremities. Stewart noted some improvement in her back pain, but it remained an actively assessed condition.

53. On September 22, 2020, Stewart saw Nicole Hamilton, NP-C. Stewart reported back pain. On exam, range of motion in the back was limited due to pain. A Toradol injection was administered, and Meloxicam was prescribed.

54. On October 6, 2020, Stewart saw NP Lasley. She complained of headaches occurring every other day. Pitting edema was noted in her lower extremities. On October 20, 2020, trace edema was noted on exam.

55. On November 5, 2020, Stewart initiated the appeals process with Lincoln. On November 12, 2020, Lincoln acknowledged receipt of her appeal.

56. On December 17, 2020, Stewart saw NP Lasley. She complained of medication side effects. NP Lasley stopped Chlorithalidone and started Baclofen. NP Lasley prepared a short

8

narrative limiting Stewart to sedentary work activity.

57. On January 4, 2021, Lincoln allowed Stewart through February 1, 2021 to provide additional evidence.

58. On January 12 and January 28, 2021, Stewart saw Charles F. Harvey, MD for a neurosurgery consultation. Dr. Harvey opined that Stewart should limit repetitive motions and lifting to no more than 15-20 pounds

59. On January 29, 2021, Stewart appealed Lincoln's decision denying her claim to LTD benefits. Stewart's appeal contained additional evidence and argument.

60. Stewart's appeal also contained requests that Lincoln included a request for information about the third-party organizations responsible for evidence from medical consultants, as well as those consultants' curriculum vitae.

61. By February 4, 2021, Lincoln confirmed receipt of Stewart's appeal evidence and indicated that the claim was under peer review.

62. On February 22, 2021, Stewart provided to Lincoln her updated records from Dr. Harvey.

63. On March 8, 2021, Lincoln issued a decision upholding its initial denial.

64. In its denial, Lincoln characterized Stewart's occupation as Blow Molding Machine Operator, a light exertional occupation.

65. In its denial, Lincoln summarized in two sentences the evidence submitted by Stewart with her appeal.

66. In its denial, Lincoln relied on the February 19, 2021 opinion of Solomon Rojhani, MD. Dr. Rojhani acknowledged Stewart's "clinical findings of pain" but opined that Stewart did not suffer from even a single restriction.

67. In its denial letter, Lincoln inaccurately stated that it provided a copy of Dr. Rojhani's report

9

to Stewart.

68. Lincoln hired Dr. Rojhani through one of its regular medical consultant vendors with which it has a longstanding business arrangement (Exam Coordinators Network, a division of Genex Services, LLC).

69. Stewart has exhausted administrative remedies.

70. Stewart remains Totally Disabled as defined the Policy.

CAUSES OF ACTION
COUNT I
29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

71. Stewart realleges the preceding paragraphs as if fully set forth herein.

72. Stewart is entitled to all unpaid and accrued LTD benefits, as Lincoln:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to properly consider each of Stewart's medical impairments and resulting limitations;

    c. Mischaracterized medical records and opinions;

    d. Mischaracterized Stewart's complaints, symptoms, medical conditions, abilities, and functional limitations; and

    e. Issued an unfavorable decision that was arbitrary and capricious.

73. Pursuant to 29 U.S.C. § 1132(a)(1)(b), Stewart is entitled to an award of actual damages for losses suffered.

74. Pursuant to 29 U.S.C. § 1132(g), judgment may include compensation for a beneficiary's attorney's fees, costs, and prejudgment interest.

75. Lincoln has not satisfied its obligation to pay Stewart LTD benefits.

76. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Stewart prays for judgment against Lincoln for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

COUNT II
29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

77. Stewart realleges the preceding paragraphs as if fully set forth herein.

78. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

> "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

79. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

> "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

80. As the Plan's designated claims administrator and entity exercising discretion in claims administration, Lincoln is a fiduciary.

81. Stewart participated in and benefitted from the Plan as previously indicated.

82. As the payor of benefits and the entity responsible for benefits determinations Lincoln operates under an inherent structural conflict of interest.

83. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs Lincoln's actions as a fiduciary.

84. In reducing Stewart's appeal evidence and argument to two sentences, Lincoln breached its fiduciary duty to behave as a reasonable claims administrator obligated to provide Stewart a full and fair review.

85. In failing to consider and evaluate Stewart's arguments regarding the nature and demands of her Regular Occupation as a Packer, Lincoln breached its fiduciary duty. Lincoln's denial

11

letter did not acknowledge or contain a rationale for dismissing over three pages of argument as to why her occupation was a Packer rather than Blow Molding Machine Operator.

86. In failing to adequately apply the Policy's applicable provisions, including each component of the definitions of "Total Disability," "Regular Occupation," and "Material Duties," Lincoln breached its fiduciary duties.

87. Lincoln's review was inconsistent with its own guidelines and procedures. Its claims handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving medical and vocational consultants. In failing to comply with its internal guidelines and claims processing procedures, Lincoln breached its fiduciary duties.

88. Lincoln did not compensate and use its medical and vocational consultants for the exclusive purpose of providing benefits to Plan participants. Nor did it do so for the purpose of defraying reasonable expenses in administering the Plan. Rather, Lincoln contracted with these vendors and consultants for the purpose of denying benefits, compensating them at rates that did not comport with its duty to defray reasonable expenses. This conduct is indicative of a breach of Lincoln's fiduciary duties.

89. Lincoln breached its fiduciary duties by automatically accepting the findings of reports provided by its paid reviewers – a systematic practice in its claim administration. This includes the report of Dr. Cirincione, whose conclusions have been criticized in multiple ERISA disability federal district court actions, as well as the report of Dr. Rojhani.

90. Lincoln breached its fiduciary duty in ignoring Stewart's requests that Lincoln identify the third-party organizations responsible for evidence from medical consultants, as well as those consultants' curriculum vitae and any preferred reports.

91. Lincoln denied Stewart's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

92. Lincoln failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Stewart and the Plan's participants and beneficiaries generally.

93. Lincoln's repeated improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

94. Lincoln's violations of regulations alone allow Stewart the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(l)(2)(i).

95. Lincoln's violations of federal regulation also subject its decision to *de novo* review.

96. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Stewart prays for an order that Lincoln retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Lincoln in its fiduciary capacity; for an equitable accounting of benefits that Lincoln has withheld; for the disgorgement of profits enjoyed by Lincoln in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an award of attorney fees; for an equitable order prohibiting Lincoln's use of Exam Coordinators Network, Genex Services, LLC, and other partial medical consultant entities; for an equitable order removing Lincoln as the administrator of claims; and for further relief as the Court deems just.

## TRIAL LOCATION

97. Trial is to be held in Kansas City, Kansas.

                        Respectfully submitted,

                        BURNETTDRISKILL, LLC

                By:  /s/ Derrick A. Pearce
                    Derrick A. Pearce, Mo. # 42793
                    Kyle H. Sciolaro, Kan. # 24991
                    103 W 26th Ave., Ste. 290
                    North Kansas City, MO  64116
                    P: 816.781.4836
                    F: 816.792.3634
                    dpearce@burnettdriskill.com
                    ksciolaro@burnettdriskill.com
                    ATTORNEYS FOR PLAINTIFF